UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

DEBRA AVENMARG,

         Plaintiff,

    v.

HUMBOLDT COUNTY, et al.,

         Defendants.

Case No. 19-cv-05891-RMI

**ORDER ON MOTIONS TO DISMISS**

Re: Dkt. Nos. 44, 45, 46

Now pending before the court is Defendant Humboldt County's ("Defendant County") Second Motion to Dismiss (dkt. 44), which Defendant Blanck joined (dkt. 45), seeking dismissal of Plaintiff's First Amended Complaint ("FAC") (dkt. 43) without further leave to amend, and Defendant Blanck's Motion (dkt. 46) seeking dismissal of Plaintiff's Sixth Claim. Plaintiff has responded (dkts. 47, 48), and Defendants have replied (dkt. 50, 52). For the reasons stated below, Defendants' Motion (dkt. 44) is granted in part and denied in part, and Defendant Blanck's Motion (dkt. 46) is granted.

## BACKGROUND

Plaintiff filed an original complaint against Jeffrey Blanck, counsel for Humboldt County, and Humboldt County itself, for violating her rights to privacy in making familial decisions under the Fourteenth Amendment, retaliated against her for exercising that right, and interfered with her right to petition the courts under the First Amendment. Compl. (dkt. 1). Defendant County moved to dismiss (dkt. 14), and Defendant Blanck moved to join (dkt. 24) the motion which the court granted (dkt. 25). On December 19, 2019, the court held a hearing on the motions, and Plaintiff orally moved to amend her complaint (dkt. 31). The court granted Plaintiff's motion and denied

United States District Court
Northern District of California

Defendants' motions as moot. *Id*.

On January 20, 2020, Plaintiff filed the FAC (dkt. 43) which is the subject of the pending motions to dismiss. In the FAC, Plaintiff alleges eleven claims – five federal claims and six state law claims. In Claim-1, Plaintiff alleges that Defendants Blanck and County engaged in acts which interfered with her right to privacy, specifically privacy in making familial decisions, under the Due Process Clause of the Fourteenth Amendment. FAC (dkt. 43) at 18-20. The first infringing act by Defendants was wrongfully accusing Plaintiff of violating her ethical duties as an attorney in an attempt to deter her from exercising her right to make familial decisions. *Id*. at 18. Second, Defendants terminated Plaintiff when she declined their ultimatum to either rescind her motion to obtain de facto parental status or voluntarily resign from her post as counsel for the County. *Id*. In Claim-2, Plaintiff submits that Defendants retaliated against her for exercising her constitutionally protected right to make familial decisions under the Due Process Clause of the Fourteenth Amendment. *Id*. at 20-22. Defendants retaliated by: 1) wrongfully terminating Plaintiff; 2) filing motions to disqualify her from cases in her new job; and 3) Defendant Blanck filing false or inaccurate complaints to the California State Bar. *Id*. at 20. In Claim-3, Plaintiff argues that as a public employee she had a qualified right to speak on matter of public concern under the First Amendment (i.e. right to petition the courts), and Defendants interfered with that right by taking adverse employment actions against her for exercising that right. *Id*. 22-24. Claim-4 alleges that Defendants, through Defendant Blanck's and his subordinates' conduct, interfered with Plaintiff's right to familial association under the First and Fourteenth Amendments. *Id*. at 24-26. In Claim-5, Plaintiff contends that Defendant County had an official policy that County Counsel could not foster children in Humboldt county, thereby depriving Plaintiff of her right to familial association under the First and Fourteenth Amendments. *Id*. 26-28.

In Claim-6, Plaintiff alleges that Defendants' retaliatory acts, recounted in her earlier claims, violated California Labor Code § 1102.5. *Id*. at 28-30. In Claim-7, Plaintiff submits that Defendants infringed her rights to privacy in familial decision making as guaranteed by Article 1, Sec. 1 of the California Constitution. *Id*. at 30-32. Claim-8 alleges that Defendants defamed Plaintiff in violation of California Civil Code § 43. *Id*. at 32-34. In Claim-9, Plaintiff contends that

Defendants intentionally interfered with her contractual relations with Humboldt County Superior Court to represent parents and children in juvenile dependency matters in violation of California common law. *Id*. at 34-35. In Claim-10, Plaintiff alleges that Defendants engaged in the aforementioned conduct with the intent to inflict emotional distress. *Id*. at 35-36. Lastly, in Claim-11, Plaintiff alleges, in the alternative, that Defendants' conduct constituted negligent infliction of emotional distress. *Id*. at 36-37.

*Plaintiff's Factual Allegations*

In the FAC, Plaintiff begins by describing Defendant Blanck's role and authority as County Counsel. FAC (dkt. 43) at 4-5. County Counsel is appointed by Defendant County's Board of Supervisors, and at all relevant times Defendant Blanck was the appointed County Counsel. *Id*. at 4. The County Counsel's Office provided legal services to Defendant County's Child Welfare Services Department ("CWS") for trials and appeals. *Id*. at 4-5. Defendant County's CWS was responsible for the investigation and intervention of child abuse and neglect in Defendant County, and the County Counsel's Office represented CWS in statutory based dependency proceedings. *Id*. at 5. The Office was responsible for addressing potential and actual ethical conflicts of its staff arising in the course of such representation. *Id*. It addressed conflicts by creating and managing policies and procedures such as "screening off attorneys to avoid conflicts; sending the case to private counsel and/or transferring the case out of the county." *Id*. The County Counsel's Office had the authority to establish, maintain, and make decisions about potential and actual ethical conflicts. *Id*.

On December 29, 2014, Plaintiff began working for Defendant County as Deputy County Counsel at the Office of County Counsel. *Id*. She was one of three attorneys assigned to provide legal services to CWS at the trial level. *Id*. In January of 2015, Plaintiff recognized the name of a minor in a confidential dependency case. *Id*. She "immediately brought the matter to the attention of the [] County Counsel legal secretary, Eliza Onate, and informed her of the apparent conflict." *Id*. at 6.

Plaintiff recognized the name because it was her extended family member, ████████ ████████████████████████████. *Id*. at 5. Plaintiff's family ties to GN began many years

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    before her employment with Defendant County. *Id*. GN's ███████ ("GU") was a friend of

2    Plaintiff's ███ since ███████, and he eventually married Plaintiff's ███. *Id*. Plaintiff

3    maintained a close relationship with both her ███ and ███; they frequently visited one another

4    and socialized together. *Id*. Thus, Plaintiff learned of GN's impending birth from her ███, and

5    was "aware that the prospective parents were very young and at risk." *Id*. After GN's birth,

6    Plaintiff and her family frequently discussed their concerns about GN's health, safety, and welfare.

7    *Id*. In July of 2014, Plaintiff met GN for the first time at a family gathering. *Id*. at 6. He was

8    approximately 7 or 8 months old at the time. *Id*.

9        Due to the extended family connection to GN, Ms. Onate, legal secretary for the County

10   Counsel's Office, marked the file to alert staff that Plaintiff had a connection with the minor and

11   instructed others that Plaintiff was not to receive any information about the case. *Id*. at 6. Plaintiff

12   also informed the Deputy County Counsel assigned to the case of the apparent conflict to prevent

13   any potential discussions of the case. *Id*. Thereafter, the County Counsel's office determined there

14   was an apparent legal conflict of interest and created a "firewall" pursuant to the protocols,

15   policies, and procedures regarding legal conflicts of interest. *Id*. In short, Plaintiff was screened

16   from the case. *Id*.

17       On or about September 9, 2015, GN was placed in foster care by CWS. *Id*. He was

18   approximately twenty-one months old at the time. *Id*. Plaintiff informed the Deputy County

19   Counsel and attorneys involved in the matter that her ███████ namely her ███ and ███,

20   were requesting custody of GN to make them aware of her conflict on the case. *Id*. at 6-7. Plaintiff

21   explained that she should be treated as a "non-related extended family member" ("NREFM"). *Id*.

22   at 7. Around the end of September or beginning of October of 2015, GN was placed with

23   Plaintiff's ███ and ███. *Id*. Plaintiff obtained a modified work schedule with the County

24   Counsel's Office so that she could provide care for GN once a week while her ███ was at work.

25   *Id*. GN exhibited a number of negative and/or unusual behaviors that Plaintiff believed were

26   indicative of the treatment and environment which likely gave rise to his removal from his

27   parents' home. *Id*. Over their time spent together, Plaintiff and GN developed an affection for one

28   another and a clear bond. *Id*. She prepared his meals, changed his diapers, and put him to bed. *Id*.

They also played together and went for walks. *Id*. She also worked with GN to build his language and other developmental skills. *Id*. GN called Plaintiff "Auntie Debra." *Id*. GN's placement with Plaintiff's ███ and ██ became problematic, and CWS suggested that GN be placed with Plaintiff. *Id*. Other possible placements were out of the county, far from his birth home and family. *Id*. Thus, Plaintiff took action to seek appropriate approvals from both CWS and the County Counsel's Office to become GN's foster parent. *Id*. In November of 2015, Plaintiff arranged weekly meetings for GN and his Court Appointed Special Advocate ("CASA") whose job was to advocate on GN's behalf in proceedings. *Id*. at 8.

On or about December 11, 2015, Plaintiff was informed that she satisfied the requirements to become a foster parent, but CWS and the County Counsel's Office were still discussing whether Plaintiff's status as Deputy County Counsel presented issues since she represented CWS in other legal proceedings. *Id*. In the meantime, Plaintiff obtained approval to have extended visits with GN. *Id*. On December 15, 2015, Plaintiff and her spouse submitted fingerprint scans to be eligible for fostering. *Id*. Plaintiff also attempted to make an appointment with CWS to finalize the paperwork to become GN's foster parent. *Id*. However, she was informed by the assistant county counsel that further discussions were required before she could become GN's foster parent. *Id*.

On December 21, 2015, with approval from the County Counsel's Office and CWS, Plaintiff became GN's foster parent. *Id*. Plaintiff met with GN's biological parents to learn his preferences and arrange visits between them. *Id*. GN was twenty-five months old when he transitioned to Plaintiff's home. *Id*. GN and Plaintiff further developed their bond, and GN began calling Plaintiff "auntie mamma" and eventually "mamma." *Id*. Plaintiff and her husband took walks and GN would ride his tricycle; she took him swimming and to gymnastics; and they read books together every night. *Id*. GN became attached to Plaintiff and followed her around the house and wanted to be involved in everything she did, including household chores. *Id*. He would help her feed the cats, sort the laundry, and cook. *Id*. GN liked to be rolled up in a blanket and turned into a "burrito," then carried around, and delivered to Plaintiff's husband who would then pretend to eat him. *Id*. GN thrived in Plaintiffs home. *Id*. He went from being very delayed in speech to advanced for his age, and he began to exhibit strong bonding behaviors which he had not

previously exhibited. *Id*. at 8-9.

Throughout this period, Plaintiff was advised by the assistant county counsel that she was completely screened from accessing information in GN's case. *Id*. at 9. On May 13, 2016, Plaintiff found a mentor to support her as a foster parent. *Id*. On May 24, 2016, GN's case was transferred from Humboldt County Counsel's Office to the Del Norte County Counsel's Office. *Id*. Due to ethical considerations, Plaintiff was not informed of the reason for the transfer other than being informed that it was an additional screening measure. *Id*. On June 15, 2016, Plaintiff was informed by a social worker supervisor from the Humboldt County Department of Health and Human Services that Plaintiff could not be assigned a mentor or attend foster parent support groups in Humboldt county because GN's case had been transferred to Del Norte county. *Id*. On September 6, 2016, Plaintiff filed her first "Caregiver Information Form" in which she objected to a proposed visitation process for GN's mother. *Id*.

Nearly a year later, around June of 2017, Del Norte County Counsel and CWS declined to continue overseeing GN's case and transferred the matter back to Defendant County. *Id*. at 10. Humboldt County CWS then retained private, outside counsel (i.e. conflict counsel) to represent them in GN's case. *Id*. The following month, Plaintiff was advised by her employer that she must either surrender her role as a foster parent or be removed from her usual assignments which would be transferred to a newer attorney in the office (who did not handle dependency cases) as an ethical screening measure. *Id*. Plaintiff chose to switch assignments so she could continue fostering GN. *Id*. At around the same time, the assistant county counsel recommended that Plaintiff apply for "de facto parent" status and to seek an attorney to represent her in the proceedings. *Id*. Plaintiff stated she was not prepared to do so at that time. *Id*.

On August 9, 2017, the dependency court was considering the possibility of transitioning GN to his biological parents. *Id*. Plaintiff filed a second "Caregiver Information Form" regarding visitation and placement of GN. *Id*. A month later, CWS retained different, private counsel which represented CWS in GN's case until Plaintiff's eventual termination. *Id*. On September 27, 2017, Plaintiff filed a third "Caregiver Information Form" requesting visitation with GN in anticipation of GN returning to his biological parents' care. *Id*. The following day, GN was returned to the care

United States District Court
Northern District of California

1   of his biological parents. *Id*. He was nearly four years old at the time and, thus, had spent nearly

2   half of his life in Plaintiff's care. *Id*. By that time, GN called Plaintiff "mamma." *Id*.

3        Plaintiff's requests for visitation were not formally addressed by the dependency court, but

4   Plaintiff was permitted to visit GN through informal agreement; the frequency and duration of

5   which were guided by the direction of GN's therapist. *Id*. at 11. When Plaintiff saw GN at his

6   fourth birthday party, not long after he return to his parents, GN clung to her throughout the party.

7   *Id*. He showed her the birthday presents and wanted to bring them to Plaintiff's home. *Id*. Plaintiff

8   continued to visit with GN which were often occasions with many family members present

9   including: her ▮▮▮ and ▮▮▮, their children, and GN's maternal grandmother. *Id*.

10       On October 16, 2017, Plaintiff was advised by her employer that they were short staffed,

11   and she would be required to take dependency cases. *Id*. She was presented with two options: 1)

12   take CWS appeals in addition to her current assignments or 2) return to her previous assignment

13   handling CWS trial cases. *Id*. Plaintiff selected CWS appeals because GN's foster care case

14   remained open. *Id*. On October 23, 2017, Defendant Blanck and assistant county counsel informed

15   Plaintiff that she would be reassigned to CWS to take dependency trials and continue to work on

16   an appeal. *Id*. Defendant Blanck and the assistant county counsel then told Plaintiff that the

17   County Counsel's Office never had an actual conflict due to her role as a foster parent and as a

18   deputy county counsel assigned to dependency cases, but that they had undertaken cautionary

19   measures. *Id*. They added that if GN came back into Plaintiff's care, private counsel for CWS was

20   prepared to argue that there was no actual conflict. *Id*. Plaintiff asked why her duties had been

21   reassigned in the first place if they decided there was no actual conflict, and they replied that, in

22   hindsight, they would have done things differently. *Id*. Plaintiff expressed concern that carrying a

23   full dependency caseload and an appeal would be too much to do at once, and Defendant Blanck

24   dismissed her concerns. *Id*. On October 30, 2017, Defendants officially reassigned Plaintiff to

25   dependency cases. *Id*. at 12. The next month, Plaintiff was relieved from the pending appellate

26   work because of "the clear impracticability" of a full dependency case load and an appeal. *Id*.

27       In December of 2017, Plaintiff received a call from her ▮▮▮▮▮▮ explaining

28   that GN was with her and that a dating partner of one of his parents had slapped him hard enough

1    to leave a mark. *Id*. Due to a previously scheduled visit, GN was in Plaintiff's care when CWS

2    later made contact. *Id*. GN was once again transferred to the custody of his other biological parent.

3    *Id*. As a result, Plaintiff no longer had visitation through informal agreement. *Id*. From December

4    of 2017 to May of 2018, Plaintiff repeatedly tried to arrange visits with GN without success. *Id*.

5    Also, around December of 2017, the assistant county counsel directed Plaintiff to reassign six of

6    her cases because the social worker assigned to GN's case was also assigned to those six cases. *Id*.

7        On May 29, 2018, Plaintiff filed a motion for de facto parent status in GN's case to request

8    visitation and to provide the court with information about GN and his relatives. *Id*. This was

9    Plaintiff's fourth filing in GN's case during the term of her employment with the County. *Id*. That

10   day, Plaintiff was called into the office to speak with the assistant county counsel and Defendant

11   Blanck. *Id*. at 12-13. They informed Plaintiff that they had discussed Plaintiff's motions filed in

12   GN's case with the director of CWS. *Id*. at 13. They told her that, if she was given standing in

13   GN's case, her position would be potentially adverse to that of the County Counsel's Office. *Id*.

14   Plaintiff was surprised as she had filed motions in GN's case before without any issues, and it was

15   the assistant county counsel who encouraged Plaintiff to file for de facto parent status. *Id*.

16   Moreover, Defendant Blanck and assistant county counsel previously told Plaintiff that there were

17   no conflicts due to her role as GN's foster parent. *Id*. They inquired whether Plaintiff would appeal

18   if her motion in GN's case was denied, and Plaintiff responded that she would. *Id*. Defendant

19   Blanck informed Plaintiff that such an appeal would be directly adverse to the County's position

20   which would be required to defend against the motion and any subsequent appeal. *Id*. Defendant

21   Blanck and assistant county counsel encouraged Plaintiff to withdraw her motions in GN's case.

22   *Id*. They also advised her to contact the State Bar ethics hotline. *Id*. Given Plaintiff's relationship

23   and bond with GN the idea that she would abandon her efforts to be in his life was untenable and

24   inconsistent with the instructions of GN's therapist regarding his best interests and healthy

25   development. *Id*.

26        As directed, Plaintiff spoke with the State Bar ethic's hotline the following day. *Id*. The

27   hotline operator could not provide any specific authority for her situation and did not provide clear

28   guidance other than confirmation that previous ethical screening measures were significant. *Id*. 13-

United States District Court
Northern District of California

14. The hotline operator stated that the matter would benefit from a proceeding before a judge who could make a ruling after being presented with all the facts. *Id*. at 14. Plaintiff relayed this information to the assistant county counsel, who responded that she would not discuss the matter without Defendant Blanck present. *Id*.

On May 31, 2018, Plaintiff once again met with Defendant Blanck and the assistant county counsel. *Id*. Defendant Blanck told Plaintiff that she would either need to withdraw the motion for de facto parent status and her motions for visitation, or end her employment with the County. *Id*. She was given until the following Monday to decide. *Id*. The assistant county counsel added that the County Counsel's Office had a new policy that deputy county counsels could no longer take placement of foster children in Humboldt County. *Id*. The stated purpose of the policy was to eliminate potential or actual conflicts of interest. *Id*. The policy effectively prevented Plaintiff from being able to care for GN, who had lived with her for almost two years and was possibly the only familiar person willing to take him. *Id*. Plaintiff believed the policy was created specifically to justify firing her and limiting her access to the court system. *Id*. On June 4, 2018, Plaintiff told Defendant Blanck and assistant county counsel that she would neither withdraw her motions nor resign. *Id*. She was fired on the spot. *Id*.

The next day, the lead attorney for the panel of court-appointed counsel in dependency cases contacted Plaintiff and informed her that there was a newly created full-time position on the panel. *Id*. at 14-15. Lead counsel added that Plaintiff was eligible to obtain a contract with the court to the join the panel and recommended that she try to obtain a waiver of any potential conflicts from the County Counsel's Office. *Id*. at 15. A few days later, Plaintiff requested a waiver from the County Counsel's Office, and the assistant county counsel provided an encouraging response. *Id*.

On June 8, 2018, Plaintiff emailed the County's Human Resources Director to preserve her appeals rights, if any, and to state that she believed she had been wrongfully terminated. *Id*. Shortly thereafter, the assistant county counsel wrote to Plaintiff that she was made aware that Plaintiff filed a complaint regarding her termination and thus, assistant county counsel could no longer communicate with Plaintiff about her application for waiver of conflict of interest. *Id*.

On June 19, 2018, Plaintiff received notice that a hearing for her motion for de facto parent status was set for June 22, 2018. *Id*. Plaintiff then contacted GN's paternal and maternal relatives to come to court with her that day to establish a showing that GN's family supported Plaintiff's application, and that they were relying on Plaintiff so they may continue to have a relationship with GN. *Id*. At the hearing, Plaintiff, her husband, and eleven family members showed up to support her application. *Id*. Plaintiff, GN's counsel, and GN's father presented information to support Plaintiff's motion. *Id*. GN's counsel stated that GN continued to ask for Plaintiff and wanted to see her. *Id*. GN's mother opposed the motion, and CWS took a neutral position. *Id*. at 15-16. The court granted Plaintiff's motion, naming Plaintiff and her husband GN's de facto parents giving them a number of rights as a party to GN's dependency proceedings. *Id*. at 16. Plaintiff then participated in the remaining days of trial in GN's case. *Id*. At the conclusion of the contested hearing, the judge tentatively ruled that GN's mother would have primary custody. *Id*. Plaintiff was granted visitation rights. *Id*.

On July 2, 2018, Plaintiff began contracting with the Humboldt County Superior Court to accept appointments to represent parents, children, and other parties to juvenile dependency matters. *Id*. On July 9, 2018, Defendant County Counsel's Office began objecting to Plaintiff's appointment on all juvenile cases. *Id*. One deputy county counsel moved to disqualify Plaintiff from all of her cases – including newly filed cases that did not exist while she was employed by Defendant County. *Id*. Another deputy county counsel moved to disqualify Plaintiff from all of the cases that existed at the time Plaintiff worked for Defendant County. *Id*. Both argued that Plaintiff had not obtained waivers from the County or her clients, and that they could not consent to a waiver of Plaintiff's alleged conflict. *Id*. at 16-17. In addition to oral motions to disqualify, Plaintiff received written motions to disqualify her from her cases on July 10, 2018. *Id*. at 17. Defendant County filed more of the same motions the following week. *Id*. If these motions were granted, Plaintiff would have lost her assigned cases and the pay she would be due if she retained those cases. *Id*.

On July 19, 2018, a dependency court judge consolidated the motions to disqualify Plaintiff and held a hearing. *Id*. Defendant Blanck represented the County Counsel's Office and

10

argued to disqualify Plaintiff from all cases that existed in the office during her employment there. *Id*. The parties resolved the matter before a ruling was issued, and the County withdrew its motions. *Id*.

On May 17, 2019, Plaintiff received a notice from the State Bar of California that it had received a complaint from Defendant Blanck alleging that she had violated ethical rules. *Id*. On December 9, 2019, the State Bar informed Plaintiff that the complaint had been investigated and the matter did not warrant further action and would be closed. *Id*.

### STANDARD OF REVIEW

A plaintiff may bring an action under 42 U.S.C. § 1983 to redress violations of "rights, privileges, or immunities secured by the Constitution and [federal] laws," that were perpetrated by a person or entity, including a municipality, acting under the color of state law. 42 U.S.C. § 1983; *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-95 (1978). In the present context, in order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a plaintiff must allege facts that "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); thus, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the nonmoving party," *Wyler Summit Partnership v. Turner Broad. Sys. Inc.*, 135 F.3d 658, 661 (9th Cir. 1998), the court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Thus, mere recitals of the elements of a cause of action, supported only by conclusory statements, are insufficient. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

Dismissal for failure to state a claim is appropriate only where it appears, beyond doubt, that the plaintiff can prove no set of pleaded facts that would entitle her or him to relief. *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In short, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must plausibly suggest a claim entitling the plaintiff to relief. *Moss v. United States Secret Serv.*, 572

F.3d 962, 970 (9th Cir. 2009).

**DISCUSSION**

Plaintiff's federal claims are rooted in Defendants' alleged interference with her constitutional rights and retaliation for exercising those rights. Although Defendant Blanck joined in Defendant County's Second Motion to Dismiss, some of the arguments belong solely to Defendant County. The court will address Defendant County's arguments, then Defendants' shared arguments, and finally, Defendant Blanck's argument in his separate motion.

Defendant County argues that Plaintiff fails to allege a basis for municipal liability in Claims 1 through 4 because Defendant Blanck did not have final policymaking authority, and Plaintiff's allegations were unclear about what role Defendant Blanck played regarding the policy – at times alleging he created it, and other times that he "implemented or approved" it, or "acted because of" it. Defs.' Mot. (dkt. 44) at 11-13. Additionally, Defendant County argues, in Claim-2, that Plaintiff's allegation that the County "ratified and approved" Defendant Blanck's conduct is conclusory. *Id*. at 13. Plaintiff counters that her allegations that Defendant Blanck, as County Counsel, had final policymaking authority "for establishing policies and procedures to address potential and actual ethical conflicts within the Office of the County Counsel" are sufficient. Pl.'s Opp. (dkt. 47) at 11.

Both Defendants argue that Plaintiff failed to establish that her relationship with GN was constitutionally protected for Claims 1, 2, 4, and 5. Defs.' Mot. (dkt. 44) at 7. Plaintiff counters that Defendants' attempt to undermine her relationship with GN disregards the jurisprudence regarding extended family relationships. Pl.'s Opp. (dkt. 47) at 17-21. Defendants also argue that Claims 1, 2, 4, and 5 are duplicative because the relationship analysis does not vary by virtue of which Amendment (First or Fourteenth) or nature of the right (privacy or liberty) is invoked and that deciding whether to associate is the same as actually associating with another person. Defs.' Mot. (dkt. 44) at 15. Plaintiff responds that that Defendants' attempt to collapse her claims into one right – associational interest – is factually and legally inaccurate. Pl.'s Opp. (dkt. 47) at 13. She also argues that her first claim asserts two cognizable legal theories – intrusion by compelled disclosure of personal matters and attempts to interfere with her familial decisions. *Id*. at 14-15.

12

Regarding Claim-3, Defendants argue that Plaintiff's speech was not constitutionally protected because it was on a private matter, and even if it was speech on a public matter, Defendants had adequate justification, as an employer, to terminate her employment. Defs.' Mot. (dkt. 44) at 24-30. In her Opposition Plaintiff does not address whether her speech was on a public matter; instead, she argues that she spoke as a private citizen in a court proceeding, and Defendants' threats to terminate her and the policy itself constituted efforts to chill her petitioning in the dependency case. Pl.'s Opp. (dkt. 47) at 16-17. Finally, Defendants argue that the motions to disqualify were shielded from liability under the *Noerr-Pennington* doctrine – a form of First Amendment protection; and, as to her state-law claims regarding those motions, Defendants assert the motions were privileged as publications in the course of a judicial proceeding. Defs.' Mot. (dkt. 44) at 30-31. Plaintiff counters that the motions were not filed to obtain relief but rather the filing process was used to injure her, and thus, fall outside the protection of both the *Noerr-Pennington* doctrine and the state-law litigation privilege. Pl.'s Opp. (dkt. 47) at 21-22.

Separately, in his motion to dismiss Claim-6, Defendant Blanck argues that California Labor Code § 1102.5 does not provide for individual liability, and thus, Claim-6 should be dismissed. *See* Def. Blanck's Mot. (dkt. 46). Plaintiff argues that, in 2013, the code was amended to impose individual liability. Pl.'s Opp. (dkt. 48) at 9-14.

### Claims 1, 2, 3, and 4 – Municipal Liability

Local government entities are considered "persons" for the purposes of being subject to liability under § 1983 where an official policy or custom causes a constitutional tort, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); however, a municipality may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*. *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691. To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must establish: (1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy, custom or practice; (3) that the policy, custom or practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom or practice was the moving force behind the constitutional violation. *See Plumeau v.*

1   *School Dist. No. 40*, 130 F.3d 432, 438 (9th Cir. 1997); *see also AE ex rel. Hernandez v. County of*

2   *Tulare*, 666 F.3d 631, 636 (9th Cir. 2012). A plaintiff must allege sufficient facts regarding the

3   specific nature of the policy, custom or practice to allow the defendant to effectively defend itself,

4   and these facts must plausibly suggest that the plaintiff is entitled to relief. *AE ex rel. Hernandez*,

5   666 F.3d at 637.

6           A plaintiff may establish municipal liability in one of three ways: 1) establish that a formal

7   government policy or longstanding practice or custom cause her injury; 2) show that an official

8   with final policymaking authority acted in a way that injured her rights and the act was itself the

9   result of a deliberate choice made among alternatives; or 3) show an official policymaker either

10  delegated such authority to, or ratified the deprivation by, a subordinate. *See City of St. Louis v.*

11  *Praprotnik,* 485 U.S. 112, 127 (1988); *Trevino v. Gates*, 99 F.3d 911, 920-21 (9th Cir. 1996);

12  *Goldstein v. Cty. of San Mateo*, No. C 05-03209 SBA (PR), 2008 WL 2954173, at *10 (N.D. Cal.

13  July 30, 2008) (citing *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995). "Whether a

14  particular official has final policy-making authority is a question of state law." *Gillette v. Delmore*,

15  979 F.2d 1342, 1346 (9th Cir. 1992) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. at 737, 109

16  (1989); and *Praprotnik,* 485 U.S. 112, 123–24 (1988)). Additionally, "[p]roof of random acts or

17  isolated incidents of unconstitutional action by a non-policymaking employee are insufficient to

18  establish the existence of a municipal policy or custom." *Goldstein*, 2008 WL 2954173, at *11.

19          Plaintiff starts her factual allegations by laying out Defendant Blanck's position and

20  authority as County Counsel. *Id*. at 4-6. She alleged that Defendant County's Board of Supervisors

21  appointed Defendant Blanck as County Counsel, and the County Counsel's Office was established

22  in 1956. *Id*. at 4. Plaintiff explained that employees of the County Counsel's Office, including

23  Defendant Blanck, are employees of Defendant County, and the Office represented CWS in

24  dependency proceedings. *Id*. at 5. Any potential and actual ethical conflicts arising during that

25  representation were addressed by the County Counsel's Office via policies and procedures it

26  created and managed. *Id*. Defendant Blanck, as County Counsel, had final policymaking authority

27  to determine whether an ethical conflict existed, and the appropriate course of action to address

28  ethical conflicts "within the office of County Counsel." *Id*. at 6. Plaintiff alleged that Defendant

United States District Court
Northern District of California

1   Blanck approved of the actions taken in response to her alleged ethical conflict because he made

2   the initial determination that a conflict existed. *Id*. Throughout her federal claims, Plaintiff alleges

3   that "Defendants . . . directed [] subordinates in the acts that deprived Plaintiff of her rights," and

4   "Defendant Blanck knew that his subordinates were engaging in these acts . . . ." *Id*. at 18, 21, 23,

5   25, 27.

6         However, Plaintiff does not allege that any local or state laws grant Defendant Blanck final

7   policymaking authority. Additionally, in Claim-4, Plaintiff stated, without more, that Defendant

8   County "ratified and approved Defendant Blanck's actions and actions of the Assistant County

9   Counsel." FAC (dkt. 43) at 21. That is a conclusory statement and thus cannot survive a motion to

10  dismiss. However, it is not clear that these claims cannot be saved by an amendment, the dismissal

11  shall be without prejudice, and Plaintiff is granted leave to amend Claims 1, 2, 4, and 5. *See In re*

12  *Daou Systems*, 411 F.3d 1006, 1013 (9th Cir. 2005) (complaint may be dismissed with prejudice if

13  it is clear that it cannot be saved by amendment); *Bloom v. Martin*, 77 F.3d 318, 321 (9th Cir.

14  1996) ("Dismissing a complaint without leave to amend is appropriate when granting leave would

15  serve no purpose because the acts complained of cannot constitute a claim for relief."); *Bell v. City*

16  *of Kellogg*, 922 F.2d 1418, 1425 (9th Cir. 1991) (dismissal with prejudice is proper if amendment

17  "would be futile in saving the plaintiff's case"). In amending, rather than relying on conclusory

18  statements, Plaintiff must include allegations that establish the fact that Defendant Blanck had

19  final policymaking authority or that establish how a final policymaker ratified or adopted

20  Defendant Blanck's conduct. Additionally, Plaintiff should be clear about what role she believes

21  Defendant Blanck played in regard to the policy – whether he created it, implemented or approved

22  it, or that he acted because of it. Thus, Plaintiff should amend her complaint to show how she is

23  entitled to relief under a theory of municipal liability.

24  **Claims 1, 2, 4, and 5 – Constitutionally Protected Relationship**

25        The right to familial association is entirely judge-made as it does not appear in the text of

26  the Constitution. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). The Supreme Court has

27  provided guidelines to identify whether a foster relationship may be entitled to some degree of

28  constitutional protection. *See Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816

United States District Court
Northern District of California

15

(1977). In *Smith*, the Court explained that "[a]t least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family." *Id.* at 844. Later, in *Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984), the Supreme Court stated that a wide range of intimacy exists in human relationships – the most intimate being a nuclear family and the least intimate being a large business enterprise – that "may make greater or lesser claims to constitutional protection from particular incursions by the State." The Court laid out factors that may be relevant to assessing a relationship's objective characteristics to locate it on the "spectrum from the most intimate to the most attenuated of person attachments." *Id.* The factors include: size, purpose, policies, selectivity, congeniality, and other characteristics that may be relevant to a particular case. *Id.*

In the FAC, Plaintiff provided facts explaining ███████████████████████████ ████████████████████████████████████████████ FAC (dkt. 43) at 5. Plaintiff met GN at a family gathering when he was seven to eight months old; and thus, her relationship with GN pre-dated her employment with Defendant County. *Id.* at 6. She provided facts showing that before she became GN's foster parent, she obtained a modified work schedule to care for him at least once a week. *Id.* at 7. Later, when GN was twenty-five months old, Plaintiff became GN's foster parent, and he lived with Plaintiff for 2 years. *Id.* at 8. While living together, Plaintiff and GN bonded, and he eventually came to call her "mamma." *Id.* They did activities together as a family – going on walks while GN rode his tricycle, doing household chores together, reading books together every night, and playing games. *Id.* Plaintiff asserted that under her care, GN thrived and exhibited improvement in his speech development. *Id.* GN spent nearly half of his life with Plaintiff until he was returned to the care of his biological parents when he was four years old. *Id.* at 10.

In her Opposition, Plaintiff explained that the emotional bond is an important aspect of the intimate-relationship analysis and precedent places significance on extended family relationships like hers as well as nonbiological relationships such as marriage or domestic partnerships. Pl.'s

United States District Court
Northern District of California

Opp. (dkt. 47) at 17-18. Plaintiff added that the factors the Supreme Court laid out in *US Jaycees* weighed in favor of finding her relationship sufficiently intimate to garner constitutional protection. *Id*. at 19. The size of the association was small; the purpose was to create a safe and healthy environment for GN to promote his growth and wellbeing; selectivity was shown by Plaintiff's continued efforts to become closer with GN to provide aid, provide him with a home, and ultimately maintain their familial relationship; and, exclusivity existed because not all individuals could qualify as GN's foster parent, and later, his de facto parent. *Id*. Additionally, Plaintiff argues that the cases cited by Defendants to show foster relationship are not constitutionally protected are inapposite. *Id*. at 20 n.9.

Defendants argue that Plaintiff was required to show either biological relation or adoption as well as unregulated cohabitation at the time of the challenged state action to state a constitutionally protected relationship. Defs.' Mot. (dkt. 44) at 17-24. Defendants cite a string of appellate cases to support the position that foster relationships are not constitutionally protected (*id*.), but the Ninth Circuit cases do not squarely reject protection of any kind for such relationships. Rather, these cited authorities found that foster parents do not have the same level of constitutional protection as natural parents or that protections for foster relationships are limited. *See Backlund v. Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985) (finding that "foster parents do not enjoy the same constitutional protections that natural parents do."); *Gibson v. Merced Cty. Dep't of Human Res.*, 799 F.2d 582, 587–88 (9th Cir. 1986) (stating that any liberty interest asserted by foster parents is limited because California law treats foster care as part of a reunification process). Because the case law does not deny foster relationships all constitutional protection, the court will not find, on a motion to dismiss, that Plaintiff cannot allege a sufficiently intimate relationship that was entitled to at least some protection. Therefore, Defendants motion to dismiss is denied on this ground.

**Claims 1, 2, 4, and 5 – Duplicative Claims**

"The freedom of association substantially overlaps with the right of privacy." *Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1499 (9th Cir. 1987) (citing *Griswold v. Connecticut,* 381 U.S. 479, 483-84 (1965); and *NAACP v. Alabama,* 357 U.S. 449, 462(1958)). In *Fleisher*, the plaintiff

alleged in one claim that the defendants violated his right of privacy, and in another claim, he alleged that the defendants violated his freedom of association. *Fleisher*, 829 F.2d at 1493. Both claims were presented to a jury. *Id*. Upon review, the Court of Appeals for the Ninth Circuit stated that "[b]ecause the right of privacy and the freedom of intimate association have the same scope, our analysis of the freedom of association in this case is the same as our analysis of the right of privacy." *Id*. at 1500. That court, however, did not state that the claims were duplicative; only that the analysis under both amendments was the same. *See generally id*. Thus, Claims 1 and 2 will not be dismissed as duplicative of Claims 4 and 5. To the extent that Plaintiff wishes to add her claim, raised for the first time in her Opposition ((dkt. 47) at 14-16), that Defendants violated her right to be free from disclosure of personal information she must do so in an amended complaint.

**Claim 5 – Constitutionality of Policy**

Defendants argue that the policy prohibiting deputy county counsel from pursuing foster parenting was not unconstitutional on its face or as-applied to Plaintiff because her relationship with GN was not constitutionally protected. Defs.'Mot. (dkt. 44) at 21-22. As stated above, a Rule 12(b)(6) motion to dismiss tests whether Plaintiff can state a claim for relief which is plausible on its face; and, the court finds that Plaintiff has alleged sufficient facts that she had an intimate relationship with GN that may be entitled to at least some protection under the constitution. The court, however, does not venture to say what level of protection she is entitled to at the pleading stage. On this ground, Defendants' motion to dismiss is denied.

**Claim 3 – Retaliation for Petitioning**

"[T]he First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks*, 573 U.S. 228, 231 (2014) (quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)). "'In conducting this balancing, courts must give government employers wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with

18

dispatch.'" *Gilbrook v. City of Westminster*, 177 F.3d 839, 867 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) (quoting *Brewster v. Board of Education,* 149 F.3d 971, 979 (9th Cir.1998)). "[A] stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick v. Myers*, 461 U.S. 138, 152 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48. The forum where the petition is lodged is also relevant to the public-matter inquiry. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011).

Here, Plaintiff makes a conclusory statement that her speech was on a public matter. FAC (dkt. 43) at 22. The facts about her petitioning activities are that Plaintiff filed several motions in GN's dependency case to obtain certain rights in his proceedings as a de facto parent and visitation. *Id.* at 9. In her Opposition, Plaintiff did not attempt to add facts to support her bare assertion that her speech was on a public matter. Instead, she argued that she spoke as a private citizen, that her filings were submitted truthfully to assist the court in the dependency proceedings, and that Defendants attempted to interfere with her petitioning by threatening to terminate her job. *See* Pl.'s Opp. (dkt. 47) at 16-17. As far as forum and content, the court notes that dependency proceedings are confidential, and Plaintiff's petitions presented private grievances – visitation of a minor and her right to participate in GN's proceeding.[1,2] Thus, Plaintiff failed to meet the required public-speech showing, and Defendants' motion to dismiss as to Claim-3 is granted without prejudice.[3]

---

[1] "Unless requested by a parent or guardian and consented to or requested by the minor concerning whom the petition has been filed, the public shall not be admitted to a juvenile court hearing. The judge or referee may nevertheless admit such persons as he deems to have a direct and legitimate interest in the particular case or the work of the court." Cal. Welf. & Inst. Code § 346.

[2] Juvenile case files are confidential and only available to parties directly involved in the case, certain state officials, and the child's school superintendent or other designee of the school district. *See* Cal. Welf. & Inst. Code § 827. All others who wish to view a juvenile case file must file a petition with the juvenile court. *Id.*

[3] Defendant County also asserted that even if Plaintiff's speech concerned a public matter, the County's interest in "avoiding conflicts of interest between it and its attorneys outweighed [her] desire to visit [GN]." Defs.' Mot. (dkt. 44) at 27. However, the weighing of such interests is not appropriate at this early stage of litigation.

United States District Court
Northern District of California

**Claim 2 – Motions to Disqualify**

The *Noerr-Pennington* doctrine is a form of First Amendment protection that arose in the context of Antitrust liability under the Sherman Act. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961). "Although the *Noerr–Pennington* doctrine originally immunized individuals and entities from antitrust liability, *Noerr–Pennington* immunity now applies to claims under § 1983 that are based on the petitioning of public authorities." *Empress LLC v. City & Cty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005). The doctrine shields individuals and entities from liability for petitioning any part of the government for redress, even if the outcome of the petitioning results in harm to a competitor. *See id*. at 1056. It also "applies to claims under 42 U.S.C. § 1983 that are based on the petitioning of public authorities." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000)).

*Noerr-Pennington* immunity is not absolute. When the petitioning process is used to injure the plaintiff rather than to obtain relief, the sham exception applies, and a defendant may be liable for the injury caused. *Empress*, 419 F.3d at 1057. If, however, it is the desired outcome of the petitioning that harms the plaintiff, the defendants are immune from liability. *Manistee*, 227 F.3d at 1095. The sham exception is interpreted narrowly in the more political branch of the legislature, and it is more broadly applied in the judicial branch. *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1061 (9th Cir. 1998) ("[T]he political arena has a higher tolerance for outright lies than the judicial arena does.") (citing *Cal. Motor Transp. Co. v. Trucking Unltd*, 404 U.S. 508, 513 (1972)). In litigation, the standard to make out the sham exception requires a plaintiff to first show that the petitioning was "'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.'" *White v. Lee*, 227 F.3d 1214, 1231–32 (9th Cir. 2000) (quoting *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993)). Once a plaintiff satisfies that prerequisite showing, a court may consider the defendant's allegedly illegal motive to petition the government. *Id*. "The fact that a litigant loses his case does not show that his lawsuit was objectively baseless for purposes of *Noerr–Pennington* immunity." *White*, 227 F.3d at 1232.

Plaintiff argues that the numerous motions to disqualify her from the dependency cases

1    were made "without any factual basis, and contrary to prior representations." Pl.'s Opp. (dkt. 47)

2    at 22. The FAC supplies the following facts to support this argument: 1) when she was employed

3    by the County, Defendant Blanck and the assistant county counsel told Plaintiff that there was no

4    actual conflict when she fostered GN and simultaneously acted as a deputy county counsel; 2) then

5    when she became a member of the panel of court-appointed counsel in dependency proceedings,

6    deputy county counsels filed motions to disqualify Plaintiff from cases that did not exist during

7    her term of employment with Defendant County; and 3) the motions were abandoned before a

8    ruling was rendered. *See* FAC (dkt 43.) at 11, 16-17. The court finds Plaintiff's allegations that the

9    motions to disqualify were objectively baseless are sufficient to survive motion to dismiss. Thus,

10   Defendants' motion to dismiss Plaintiff's Claim-2 regarding the motions to disqualify is denied.

11   **Claim 8 - California Litigation Privilege**

12          In Claim-8, Plaintiff alleges that Defendants defamed her in violation of California Civil

13   Code § 43. *Id*. at 32-34. California Civil Code § 47(b)(2) renders privileged any publication made

14   in the course of a judicial proceeding. The privilege is absolute and covers any communication

15   related to the litigation whether or not it amounts to a publication. *Silberg v. Anderson*, 50 Cal. 3d

16   205, 215 (1990). "Any doubt as to whether the privilege applies is resolved in favor of applying

17   it." *Comstock v. Aber*, 212 Cal. App. 4th 931, 952 (2012). "Moreover, the litigation privilege

18   applies even where the communications at issue are alleged to be false or pretextual." *Gamble v.*

19   *Kaiser Found. Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1029–30 (N.D. Cal. 2018).

20          Plaintiff's Claim-8 fails to allege any facts about what specific behavior she claims

21   defamed, and merely states the elements of the claim which includes statements made verbally and

22   in writing. FAC (dkt. 43) at 32-34. In their motion, Defendants assume Claim-8 is related to the

23   motions to disqualify her in the dependency proceedings. Defs.' Mot. (dkt. 44) at 31. From the

24   facts section of the FAC, the court believes that Defendant Blanck's complaint to the California

25   bar could also be conduct associated with Claim-8. As Defendants' and the court's guesswork

26   makes clear, Plaintiff failed to allege with specificity and in a non-conclusory way Defendants

27   defamed her. Thus, Defendants' motion to dismiss on this ground is granted, and Plaintiff is

28   granted leave to amend.

**Claim 6 – California Labor Code § 1102.5**

In Claim-6, Plaintiff alleged that Defendants retaliated against her for engaging in a protected activity pursuant to Labor Code Section 1102.5. FAC (dkt. 43) at 28-30. Section 1102.5 provides, in relevant part, that employers "shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . ." Cal. Lab. Code §1102.5(b). "Section 1102.5 is a whistleblower statute, the purpose of which is to encourage[e] workplace whistle-blowers to report unlawful acts without fearing retaliation." *Lewis v. Wells Fargo Bank, N.A.*, No. LACV167377PARAOX, 2016 WL 7107760, at *2 (C.D. Cal. Dec. 5, 2016) (quoting *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 287 (2006)). Plaintiff did not allege that Defendants retaliated against her for disclosing information about a violation of or noncompliance with the law. Rather, Plaintiff alleges that Defendants retaliated against her for petitioning the government for relief in GN's dependency case. The petitioning is not a protected activity under this provision. It is unclear what conduct Plaintiff engaged in that was protected from retaliation under this particular statute. Therefore, it does not appear, from the face of the complaint, that Section 1102.5 applies, and thus, the court does not resolve the question of whether the statute imposes individual liability. Therefore, the court dismisses this claim with leave to amend in the event that Plaintiff can allege any facts that she engaged in protected whistleblower activities and that conduct was the basis for any alleged retaliation by Defendants.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (dkt. 44) is granted in part and denied in part. The court finds the following arguments by Defendants unpersuasive: that no constitutional right could be alleged; that the federal claims were duplicative; and that the facts alleged were insufficient to show the policy infringed a constitutional right. The court finds the remaining arguments persuasive, and grants Plaintiff leave to amend as follows: Claims 1-4 are dismissed with leave to amend to allege municipal liability; Claim-3 is dismissed with leave to

United States District Court
Northern District of California

1    amend to show Plaintiff's speech was on a public matter; Claim-2 is dismissed with leave to

2    amend to allege facts that the disqualification motions were objectively baseless; and Claim-8 is

3    dismissed with leave to amend to specify what speech was defamatory. Finally, Claim-6 is

4    dismissed with leave to amend to add allegations that Plaintiff engaged in protected whistleblower

5    activities and to allege acts by Defendants in retaliation of her engaging in those protected

6    activities. Defendants do not seek dismissal of the remaining state law claims, and thus, the court

7    will not reach the sufficiency of those allegations at this time.

8           Plaintiff is hereby **ORDERED** to file an amended pleading no later than 30 days from the

9    date of this order. The failure to file an amended complaint will result in a dismissal of those

10   claims with prejudice. If Plaintiff fails to amend her complaint, the FAC will remain operative for

11   Claims 1, 2, 4, and 5 as against Defendant Blanck.

12          **IT IS SO ORDERED.**

13   Dated:  April 29, 2020

14

15                                                    _____

16                                                    ROBERT M. ILLMAN
                                                      United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28